UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARIO MORENO,

               Petitioner,                                       Hon. Paul L. Maloney

v.                                                    Case No. 1:07-CV-1184

SUSAN DAVIS,

               Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Moreno's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Moreno's petition be **denied**.


## BACKGROUND

        As a result of events that allegedly occurred between 2002 and 2004, Petitioner was charged with two counts of first degree criminal sexual conduct and two counts of second degree criminal sexual conduct. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**M.T.**

M.T. testified that she was presently eleven years of age. (Dkt. #13, Trial Transcript, May 17, 2005, 133-35). Her mother is Nina T. and M.T.'s aunt (her mother's sister) is Gina Taylor. (Tr. 135-36). Gina Taylor was previously married to Petitioner. (Tr. 136-37).

M.T. testified that "about 2002" she used to regularly visit her cousins at Petitioner's residence. (Tr. 137-39). Nina T. would drive M.T. to Petitioner's residence on Saturday and Petitioner would drive her back home the next day. (Tr. 139-40). M.T. usually slept on the couch and wore either pajamas or her underwear and one of Petitioner's t-shirts. (Tr. 140-43).

During these visits, Petitioner would often awake M.T. and tell her that they were going to have "secret time." (Tr. 145-46). During this time, M.T. would sit on Petitioner's lap while the two played computer games. (Tr. 146-49). On "a lot" of these occasions, Petitioner penetrated M.T.'s vagina with one of his fingers. (Tr. 149-53). When M.T. told Petitioner to "stop," Petitioner responded, "let me do it for a few more minutes." (Tr. 152). On other occasions, Petitioner would approach M.T. while she was laying on the couch and lift up her shirt and rub her chest. (Tr. 153-54). M.T. also described two specific instances in which Petitioner vaginally penetrated her with his penis. (Tr. 156-67).

M.T. testified that she did not tell her mother about Petitioner's actions because she was afraid her mother "would be mad at me." (Tr. 154-55). M.T. was also afraid that she "wouldn't get to see [her cousins] anymore." (Tr. 155). M.T. did not tell Petitioner's wife about these incidents because M.T. was afraid she would not believe her. (Tr. 168-69). M.T. was later involved in counseling because she was fighting with her younger sister. (Dkt. #14, Trial Transcript, May 17, 2005, 3-4). During one particular session, the counselor, Kathy Lyons, asked M.T. if she had

been touched inappropriately. (Tr. 4-5). M.T. answered that "Uncle Mario" had done so. (Tr. 5-6). M.T. testified that she told Lyons about Petitioner's actions because she "didn't want it to happen to me anymore." (Trial Transcript, May 18, 2005, 32-34).

**Nina T.**

Nina T. is M.T.'s mother. (Trial Transcript, May 18, 2005, 47). Nina testified that she had known Petitioner since 1985 and that M.T. had known him since 1994. (Tr. 47). Petitioner had previously been married to Nina's sister, Gina Taylor. (Tr. 47). M.T. was approximately 3-4 years old when Petitioner and Taylor divorced. (Tr. 48). When M.T. was "around seven" years old she began visiting her cousins at Petitioner's residence. (Tr. 48). M.T. visited her cousins "every other weekend" and would stay from Friday or Saturday night until Sunday. (Tr. 50-51).

When M.T. was "around" 9 years old she began exhibiting "behavioral changes," including displays of anger, "temper tantrums," and "threatening to kill herself." (Tr. 52). In response, Nina arranged for M.T. to begin counseling with Kathy Lyons. (Tr. 53-54). Nina was present during the initial counseling session on March 23, 2004, when M.T. reported that Petitioner had sexually abused her. (Tr. 53-59). M.T. appeared to be scared and upset when she related this information. (Tr. 59-60). M.T. was interviewed by Police Officer Logan Bishop later that day. (Tr. 56-62). The following week, M.T. was examined by Dr. Collette Gushurst. (Tr. 62).

Nina also testified concerning her previous knowledge of Petitioner. Nina first met Petitioner in 1985, when he began dating her older sister. (Tr. 64-66). Nina was 10-11 years old at the time. (Tr. 65-66). Petitioner later began living with Nina and her family. (Tr. 65). On "several" occasions during this time, Petitioner climbed into Nina's bed and began touching her

breasts and vagina while she was sleeping. (Tr. 65-68). When Nina threatened to tell her sister about Petitioner's conduct, Petitioner told Nina that if she did so, her sister "wouldn't love [her] anymore or have anything to do with [her] anymore." (Tr. 68). Petitioner and Nina's sister eventually got married and moved out. (Tr. 70). Nina related another similar incident that occurred in 1990. (Tr. 71-72). Petitioner "apologized" to Nina, "years later," for his behavior. (Tr. 74-75). Nina reported Petitioner's actions to the police. (Tr. 78-80). When Nina's sister learned of this, she stopped having contact with Nina and did not allow Nina to associate with her children. (Tr. 80). Nina testified that she did not pursue the matter further because "my sister had already disowned me" and she felt that "nothing would come out of it." (Tr. 87).

When asked why, "knowing what [Petitioner] had done to you sexually," she allowed her daughter to visit Petitioner, Nina responded, "because after he divorced my sister, he had changed." (Tr. 87). Nina related that Petitioner "had counseling" to treat "addictions." (Tr. 87-88). Petitioner met another woman and got remarried. (Tr. 87-88). He also "had found God. . .had bec[o]me very active in his church. . .[and] was a youth minister." (Tr. 88). Nina believed that Petitioner had become "a different person; a better person." (Tr. 88). Nina testified that she "forgave" Petitioner for his past behavior and believed that it was safe for her daughter to visit her cousins at Petitioner's residence. (Tr. 89-90).

**Dr. Collette Gushurst**

Dr. Gushurst was recognized as an expert in the areas of pediatrics and child sexual abuse. (Trial Transcript, May 18, 2005, 112-17). Dr. Gushurst examined M.T. on April 2, 2004. (Tr. 117). M.T.'s mother was present during the examination, but the doctor instructed her "not to

interject while [she was] doing the examination or talking to [M.T.]." (Tr. 123). M.T.'s mother complied with this instruction. (Tr. 123).

The doctor initially assessed M.T.'s cognitive abilities, concluding that such were "appropriate for her age." (Tr. 117-20). The doctor also determined that M.T.'s prior medical history was unremarkable. (Tr. 119-20). An examination of M.T.'s genitalia did not reveal evidence of trauma or hymeneal tear. (Tr. 124-26). When Dr. Gushurst then asked M.T. to demonstrate precisely "where she felt [Petitioner's] private parts," M.T. identified "the outer area of the labia, on both sides." (Tr. 126-27).

Dr. Gushurst testified that her findings were not inconsistent with M.T.'s testimony. (Tr. 128-30). Specifically, the doctor stated that, "[n]ot finding any evidence of trauma is very consistent with objects that may go beyond the labia because we wouldn't expect to find - we wouldn't necessarily expect to find trauma every time something goes in that area beyond the labia." (Tr. 130). The following exchange then occurred between the prosecutor and Dr. Gushurst:

| | |
|---|---|
| Prosecutor: | All right. So you can have labial penetration without there being any signs or affect upon the hymenal tissue? |
| Dr. Gushurst: | Yes, absolutely. And that's actually the most common type of molestation in children because if a child really has penetration of the hymen, most often times that will cause a hymeneal tear, and will cause bleeding, and terrible pain, and it's hard for children to keep that contained and not have it be obvious to other people that something really bad happened, where as when there is not the type of trauma that causes bleeding and that sort of thing, it's very consistent to have no |

5

> physical findings and still have a child
> who experiences those sensations.

(Tr. 130-31).

Dr. Gushurst further testified that if an individual were to "rub" an object "in the area of the labia" it "might [cause] irritation, redness, [or] superficial abrasions." (Tr. 133). The doctor noted, however, that such injuries would heal within "a couple of days." (Tr. 133-34).

**Logan Bishop**

As of March 23, 2004, Bishop was employed as a Public Safety Officer for Emmett Township. (Trial Transcript, May 18, 2005, 147). On that date, Bishop was dispatched to meet with Kathy Lyons "who was conducting an interview with a juvenile." (Tr. 147-48). When Bishop arrived, Lyons briefly described why she had contacted the police, at which point Officer Bishop spoke with M.T. (Tr. 148-49). After speaking with M.T., Officer Bishop completed a report which he provided to Detective Brady Keys. (Tr. 149-53).

**Gina Taylor**

Gina T. is Nina T's older sister. (Trial Transcript, May 18, 2005, 162). Petitioner moved in with Gina and her family in January 1985. (Tr. 163). Gina married Petitioner in August 1985 and the pair lived with Gina's family until January 1987. (Tr. 162-63). Gina testified that during this period of time "there was opportunity," given everybody's respective work and school schedules, for Petitioner to be alone with Nina and engage in "sexual activity." (Tr. 164-70, 176-79). During this time, Nina never reported to Gina that Petitioner had engaged in any inappropriate behavior. (Tr. 170-71).

In 1990, however, Nina informed Gina that Petitioner "had tried to mess with her." (Tr. 171, 174). When Gina approached Petitioner about the matter, Petitioner stated that "it was a misunderstanding." (Tr. 172-74). Petitioner explained that "he had been rubbing [Nina's] back and shoulders and his hand slipped and accidentally came across her breast and she misunderstood that." (Tr. 174-75). A "couple of weeks" later, Petitioner acknowledged to Gina that "he felt bad because he had sexual feelings towards [Nina] and he knew they were wrong." (Tr. 175-76).

**Lisa Grenon**

As of March 26, 2004, Grenon was employed as a forensic interviewer with the Battle Creek Sexual Assault Services and Child Advocacy Center. (Trial Transcript, May 18, 2005, 180-88). On that date, Grenon interviewed M.T. (Tr. 186). Grenon testified that given her experience as a forensic interviewer, as well as her 12 years experience as a child abuse investigator, "it is very common" for children to delay reporting sexual abuse. (Tr. 187-88).

**Brady Keys**

As of March 24, 2004, Keys was employed as a Detective for the Emmett Township Department of Public Safety. (Trial Transcript, May 19, 2005, 5-6). On that date, Keys was assigned as lead detective on the case involving M.T.'s allegations against Petitioner. (Tr. 5-6). On April 2, 2004, Detective Keys interviewed Petitioner. (Tr. 7). This interview was videotaped and played for the jury.[1] (Tr. 7). Detective Keys testified that he had investigated close to 200 criminal sexual assault cases in his career and that "well over 90 percent" of victims "delayed reporting" the

---

[1] The record before the Court contains neither a copy of the videotaped interview nor a transcript thereof.

matter.  (Tr. 8-9).

Following the presentation of evidence, the jury found Petitioner guilty of two counts of first degree criminal sexual conduct and two counts of second degree criminal sexual conduct. (Trial Transcript, May 20, 2005, 4-5).  Petitioner was sentenced to serve concurrent sentences of 12-20 years for each conviction of first degree criminal sexual conduct and 5-15 years for each conviction of second degree criminal sexual conduct.  (Sentence Transcript, June 27, 2005, 9). Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

I.    Defendant/Appellant's state and federal rights to the assistance of counsel were violated where trial counsel failed to investigate and present a substantial defense.

II.   Trial counsel's failure to object to patently inadmissible and highly prejudicial evidence constitutes ineffective assistance of counsel under the Sixth Amendment and requires a new trial where the errors were so substantial that they could have changed the outcome of the trial.

III.  Defendant's right to the effective assistance of counsel under the federal and state constitutions was denied where trial counsel did not object to the admission of numerous uncharged bad acts and other evidence and information where the probative value was far outweighed by its prejudicial effect.[2]

IV.   Because competency is an ongoing concern, Defendant/Appellant's conviction and sentence should be set aside where strong indicators that he was not competent to proceed and defense counsel was ineffective for failing to request a competency evaluation.

---

[2]  Habeas Claim III raises the very same issues as are asserted in Habeas Claim II.

V.    Defendant/Appellant was denied his state and federal right to the effective assistance of counsel on appeal due to appellate counsel's failure to file a brief on appeal and request an evidentiary hearing in the trial court.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Moreno,* No. 264057, Opinion (Mich. Ct. App., Dec. 21, 2006). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Moreno,* No. 133185, Order (Mich., May 30, 2007). On November 26, 2007, Petitioner initiated the present action in which he asserts the five claims identified above.

## STANDARD OF REVIEW

Moreno's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule

from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let

alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.       **Ineffective Assistance - Failure to Investigate and Present Defense**

Petitioner asserts that his trial counsel "failed to investigate and present a substantial defense," thereby violating his Sixth Amendment right to the effective assistance of counsel.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for

Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

Petitioner asserts that his trial attorney "failed to investigate the case" and never discussed with him "possible defenses and/or witnesses." (Dkt. #2 at 5). According to Petitioner, counsel likewise "did not file a witness list" and "also informed Petitioner that he did not need to investigate since it was [the prosecution's] job to prove Petitioner's guilt." Petitioner further asserts that counsel assured him "that his case was winnable but never discussed with Petitioner how he was going to win the case." *Id.* While Petitioner asserts that counsel "failed to investigate and present a substantial defense," he has failed to identify any evidence that counsel failed to discover or any defense that counsel should have pursued.

Petitioner asserts that counsel failed to contact or question at trial "these res gestae witnesses." (Dkt. #2 at 8). A res gestae witness is defined as "an eyewitness to some even in the continuum of the criminal transaction and one whose testimony will aid in developing a full disclosure of the facts surrounding the alleged commission of the charged offense." *People v. Randolph*, 648 N.W.2d 164, 189 (Mich. 2002). Petitioner has completely failed to identify "these" alleged res gestae witnesses. There is no indication in the record that there existed any eyewitnesses to Petitioner's alleged acts of sexual abuse whose testimony could have benefitted Petitioner. Petitioner has failed to identify any witness, res gestae or otherwise, who would have presented exculpatory testimony.

In light of Petitioner's allegations, it appears that counsel's trial strategy was to require the prosecution to establish Petitioner's guilt beyond a reasonable doubt. Such is certainly

consistent with counsel's opening statement and closing argument to the jury. (Trial Transcript, May 17, 2005, 130-32; Trial Transcript, May 19, 2005, 54-85). Depending on the circumstances, such can certainly constitute a valid strategy. *See, e.g., United States v. Gonzalez*, - - - F.3d - - -, 2010 WL 702297 at *8 (10th Cir., Mar. 2, 2010) (recognizing the reasonableness of the strategy to "put the government to its burden of proof"); *Bloomfield v. Senkowski*, 2008 WL 2097423 at *34 (E.D.N.Y., May 15, 2008) (same). Petitioner has failed to present any evidence that such did not constitute "sound trial strategy."

The Michigan Court of Appeals found this claim to be without merit. *Moreno,* No. 264057, Opinion at 2. In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, the undersigned recommends that this claim be rejected.

## II.        Ineffective Assistance - Failure to Object to Prejudicial Evidence

Petitioner asserts that his attorney improperly failed to object to the introduction of "patently inadmissible and highly prejudicial evidence." (Dkt. #2 at 10). Petitioner has failed, however, to identify with any specificity the evidence in question. The only clue offered by Petitioner in this regard is the following statement: "A few of the numerous examples of highly inadmissible and prejudicial evidence; past drug use, alcohol use, sexual misconduct, Petitioner's characteriz[ation] as a 'monster', etc." (Dkt. #2 at 11-12). Petitioner has failed to identify the precise nature of this alleged evidence, who allegedly offered such, or even where in the record the

introduction of such evidence is to be found.  The Court, therefore, is left to guess at the basis for this particular claim.

A.       Petitioner's Previous Drug and Alcohol Use

The Court finds no reference in the trial record where evidence was introduced (or attempted to be introduced) that Petitioner previously used drugs or alcohol.  The victim's mother, Nina T., made reference to Petitioner having previously participated in "counseling" and that following such, Petitioner "no longer had" his "previous addictions."  (Trial Transcript, May 18, 2005, 87-90).  Nina did not, however, indicate or suggest what addictions Petitioner may have been experiencing.   Furthermore, the trial judge expressly instructed the jurors that the testimony regarding Petitioner's previous counseling was to be considered "only as it relates to weighing [Nina's] decision to let her daughter visit the defendant" and was not to be considered, "in any fashion, in determining that the defendant was addicted to any substance, that he received counseling, or what the counseling was for."  (Tr. 93-94).

Contrary to Petitioner's argument, counsel did object to Nina T's testimony that Petitioner participated in counseling and suffered from unspecified addictions. (Tr. 81-86).  The trial judge was unpersuaded by counsel's argument, however, and permitted the testimony in question, subject to the aforementioned limiting instruction.  The Michigan Court of Appeals rejected this particular claim on the ground that counsel had, in fact, "unsuccessfully objected to the testimony of defendant's substance abuse, contrary to [Petitioner's] position on appeal." *Moreno,* No. 264057, Opinion at 2.  As this conclusion is not based on an unreasonable determination of the facts and is neither contrary to, nor involves an unreasonable application of, clearly established federal law, the

undersigned recommends that this claim be denied.

B.       Petitioner's Prior Sexual Misconduct

As described above, the victim's mother testified in detail about the sexual abuse Petitioner allegedly perpetrated against her.  Petitioner argues that his trial counsel was ineffective for failing to challenge the introduction of this testimony.

Before the presentation of evidence, Petitioner raised an objection to evidence that the prosecutor sought to introduce pursuant to Michigan Rule of Evidence 404(b).[3]   (Trial

---

[3] This Rule provides as follows:  CHARACTER EVIDENCE NOT ADMISSIBLE TO PROVE CONDUCT; EXCEPTIONS; OTHER CRIMES

(a) Character evidence generally.  Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

    (1)      Character of accused.  Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same; or if evidence of a trait of character of the alleged victim of the crime is offered by the accused and admitted under subdivision (a)(2), evidence of a trait of character for aggression of the accused offered by the prosecution;

    (2)      Character of alleged victim of homicide.  When self-defense is an issue in a charge of homicide, evidence of a trait of character for aggression of the alleged victim of the crime offered by an accused, or evidence offered by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a charge of homicide to rebut evidence that the alleged victim was the first aggressor;

    (3)      Character of alleged victim of sexual conduct crime.  In a prosecution for criminal sexual conduct, evidence of the alleged victim's past sexual conduct with the defendant and evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease;

    (4)      Character of witness.  Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

(b) Other crimes, wrongs, or acts.

    (1)      Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

    (2)      The prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial and the rationale, whether or not mentioned in subparagraph (b)(1), for

Transcript, May 17, 2005, 101-02). The prosecutor sought to introduce evidence from three individuals pursuant to Rule 404(b): (1) Nina T; (2) Kantreus McBride; and (3) Angela Defeoria. (Tr. 103). The trial judge took the matter under advisement and the trial proceeded. (Tr. 108-09). The following day, the prosecutor struck Angela Defeoria from its witness list. (Trial Transcript, May 18, 2005, 35-36). The trial judge then granted Petitioner's motion to prevent Kantreus McBride from offering testimony that Petitioner had sexually assaulted her previously. (Tr. 43-44). Finally, with respect to Nina T, Petitioner's counsel indicated that "if her testimony related strictly to any prior acts by [Petitioner]" he would not object to such. (Tr. 41). Counsel reiterated, however, that he objected to any testimony from Nina that concerned "counseling" and "things like that." (Tr. 41). The trial judge denied counsel's objection, subject to the limiting instruction described in the preceding section. (Tr. 85-86).

Petitioner is correct, therefore, that his attorney did not object to the testimony offered by Nina T. that Petitioner sexually assaulted her when she was a young girl. The Michigan Court of Appeals concluded that the evidence in question was admissible under Michigan Rule of Evidence 404(b) because Nina's testimony "described instances of defendant's past sexual misconduct that were sufficiently similar to the experiences of the victim to establish a common scheme or plan." *Moreno,* No. 264057, Opinion at 2-4. Accordingly, the court rejected Petitioner's ineffective assistance of counsel claim on the ground that any objection to the admission of Nina's testimony would have been "futile."

In light of the above authority and facts, the Court concludes that this decision is

admitting the evidence. If necessary to a determination of the admissibility of the evidence under this rule, the defendant shall be required to state the theory or theories of defense, limited only by the defendant's privilege against self-incrimination.

neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, the undersigned recommends that this claim be rejected.

C.    Characterization of Petitioner as a Monster

Petitioner has not identified the evidence or statements on which this claim relies, but it appears that Petitioner is referring to the following portion of the prosecutor's closing argument:

> Well, that's, as you look at the evidence, not the case. [M.T.] wasn't talking about some kind of fanciful idea. She wasn't talking about aliens. She wasn't talking about mystical creatures. She wasn't talking about unicorns. She wasn't talking about things of that nature. What [M.T.] was talking about was something completely different.
>
> Now, was [M.T.] talking about a monster? She was, indeed, talking about a monster because, quite frankly, ladies and gentlemen, it would take someone of monstrous intentions to do this to a child of this age; any child; any unwilling participant.
>
> You know, the word monster kind of conjures up images of Frankenstein, Dracula, the Wolfman, you know, and that's for those of us who are old enough to remember those kind of things as being monsters. For the younger people, it conjures up images of Jason Voorhees (phonetic), Michael Meyers (phonetic), Freddie Krueger (phonetic). All of these characters being the brainchild of authors and screenwriters. All of these characters being fictional flights of fantasy. And, in fact, they are fantasy and nothing but fantasy. They prey on the fears of, you know, kind of supernatural powers and of the unknown. I mean, that's the whole idea as to what people do when they create these kind of characters. They want them to frighten you.
>
> Well, [M.T.] had something that kind of frightened her, too. [M.T.] had her own personal monster. Not one covered in coarse, you know, dark hair; not one with, you know, fang-like incisors; not one that

18

carried around a machete or one that wore a hockey mask. This was a monster, but it was a monster that was not created as kind of a flight of fantasy. It was a monster that was not one that was brought from the deep recesses of her subconscious. It was a monster that she did not create because she had no part in creating this monster. This monster was real. It was all too real. It wasn't a figment of her imagination. It was not a lie that she conjured up. This was not something that [M.T.] created.

You see, this monster had a name, and this monster had a face, and this monster had a family relationship to her family. He didn't invade her dreams, but he did invade her sleep. He would ask her if she wanted to have secret time, and he would take her, and he would entertain her, and he would let her watch video games, or play video games. He would let her use the computer to play her favorite game, solitaire. And, after that, then he would do the unthinkable to her. Rather than most monsters, you know, monsters that drink your blood like a vampire, or monsters that devour human flesh, this monster didn't do that. What this monster did is this monster sexually molested [M.T.].

Petitioner's counsel did not object to these comments. Petitioner asserts that this failure constitutes ineffective assistance. As the Michigan Court of Appeals recognized, under Michigan law "prosecutors may use 'hard language' when it is supported by evidence and are not required to phrase arguments in the blandest of all possible terms." *Moreno,* No. 264057, Opinion at 4 (quoting *People v. Ullah*, 550 N.W.2d 568, 574 (Mich. Ct. App. 1996)). As the *Ullah* court further observed, "[e]motional language may be used during closing argument and is 'an important weapon in counsel's forensic arsenal.'" *Ullah*, 550 N.W.2d at 574.

The Michigan Court of Appeals determined that the comments at issue presently, when "[e]xamined in context," were "properly directed at defendant's conduct underlying the charged crime, rather than other crimes or bad acts." *Moreno,* No. 264057, Opinion at 4. Accordingly, the court concluded that because the comments in question constituted appropriate argument concerning the evidence, counsel was not ineffective for failing to object thereto. *Id.* As

this conclusion is not based on an unreasonable determination of the facts and is neither contrary to, nor involves an unreasonable application of, clearly established federal law, the undersigned recommends that this claim be denied.

## III.　　　　Failure to Request a Competency Hearing

Petitioner asserts that he "had been diagnosed as paranoid schizophrenic, was taking various medications, and had at least three (3) psychotic breakdowns and hospitalizations prior to his trial." (Dkt. #2 at 17).  Petitioner further asserts that during his trial he "suffered delusions and was hearing 'voices.'" *Id.*  Petitioner has also submitted an affidavit, executed on March 7, 2006, in which he asserts he suffered a "psychotic breakdown" in April 1987, July 2004, January 2005, and February 2005.  (Dkt. #20).  Petitioner asserts that when he fails to take his medication he becomes paranoid, suspicious, and delusional.  Petitioner also asserts that "during my trial I was having audio hallucinations and was hearing unknown voices as the trial [w]as progressing."  *Id.* Petitioner asserts that in light of such, his attorney was ineffective for "failing to request a competency evaluation."　　　With respect to this claim, the Michigan Court of Appeals observed that under Michigan law, "[a] criminal defendant is presumed competent to stand trial absent facts that raise a bona fide doubt as to his competency."  *Moreno,* No. 264057, Opinion at 4.  The burden rested with Petitioner "to demonstrate that he was "incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner."  As the court of appeals correctly observed, Petitioner did not assert that he lacked the capacity or ability to understand the proceedings against him or assist in his defense. Moreover, Petitioner submitted no evidence (aside from his unsubstantiated assertions) from which

such could reasonably be inferred. Accordingly, the court concluded that "[g]iven the absence of any evidence that a competency hearing was warranted, defendant has not met his burden of proof that his counsel's conduct in failing to raise the issue amounted to ineffective assistance of counsel." *Id.* As this conclusion is not based on an unreasonable determination of the facts and is neither contrary to, nor involves an unreasonable application of, clearly established federal law, the undersigned recommends that this claim be denied.


**IV.**         **Appellate Counsel**

Petitioner asserts that on direct appeal he was initially represented by attorney Daniel Rust. (Dkt. #2 at 21). Petitioner asserts that Rust failed to file an appellate brief on his behalf. Petitioner further asserts that Rust failed to file a motion for new trial or move to remand the matter to the trial court for purposes of a *Ginther* hearing. Petitioner asserts that such constitutes ineffective assistance of counsel.

Even if attorney Rust's conduct was deficient, Petitioner cannot demonstrate that he was prejudiced thereby. While Petitioner's appeal before the Michigan Court of Appeals was pending, Petitioner's current counsel assumed representation of Petitioner. Counsel filed multiple briefs in support of Petitioner's appeal. Counsel also moved to remand the matter to the trial court for purposes of a *Ginther* hearing. The Michigan Court of Appeals considered on the merits the issues raised by counsel in his pleadings. As for counsel's request to remand the matter, the court stated that such "was denied because defendant failed to provide sufficient detail or an adequate offer of proof to suggest that an evidentiary hearing on remand was warranted, not because it was untimely filed." *Moreno,* No. 264057, Opinion at 5.

In sum, Petitioner's current counsel performed before the Michigan Court of Appeals the actions that attorney Rust allegedly failed to perform. Counsel's arguments and motions were considered on the merits. Thus, Petitioner cannot establish that he suffered any prejudice as a result of attorney Rust's allegedly deficient performance. The undersigned recommends, therefore, that this claim raises no issue on which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Moreno's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  April 26, 2010                         /s/ Ellen S. Carmody
                                              ELLEN S. CARMODY
                                              United States Magistrate Judge